# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Vera Dixon,

      Plaintiff,

v.

**Memorandum of Law & Order**
Civil File No. 09-1099 (MJD/AJB)

Mount Olivet Careview Home,

      Defendant.

Clayton D. Halunen, Daniel G. Leland, Halunen & Associates, Counsel for Plaintiff.

Thomas A. Harder, Jared D. Kemper, Shawn M. Dobbins, Foley & Mansfield, PLLP, Counsel for Defendant.

## I.    INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment [Docket No. 37], and Defendant's Motion for Summary Judgment [Docket No. 51].  In the Complaint, Plaintiff alleges the following five counts of discrimination and retaliation: (1) discrimination on the basis of race/national origin in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 <u>et seq</u>; (2) discrimination on the basis of disability in

violation of the MHRA; (3) reprisal in violation of the MHRA; (4) retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 et seq; and (5) violation of the Minnesota Whistleblower Law, Minn. Stat. § 181.932. Plaintiff has voluntarily dismissed with prejudice her claim under Count 1. For the reasons stated below, the Court now denies Plaintiff's motion and grants in part and denies in part Defendant's motion.

## II.    FACTUAL BACKGROUND

### A. Plaintiff's Work History

Plaintiff Vera Dixon was hired by Defendant Mount Olivet Careview Home ("Mount Olivet") in 2002 and worked for 6 years as a nursing assistant until December 8, 2008. At all relevant times, Tim Hokanson was the Administrator of Mount Olivet and Tamara Nelson was the Resident Services Coordinator. Nelson overlooked discipline given to nurses from nurse managers, and was responsible for administering employee discipline for a period of time. At all relevant times, Deborah Comeau was Mount Olivet's Director of Nursing and was responsible for conducting workplace investigations of nursing assistants. During the fall of 2008, Debra Welin was the Nurse Manager that had supervisory authority over Dixon.

On August 19, 2005, Dixon was promoted to the position of Nurse Assistant/Resident Coordinator (or "NA/R Charge"). (Id., Ex. 7.) This position was a supervisory role and Plaintiff was responsible for overseeing the work of Nursing Assistants. Throughout her employment, Dixon's performance reviews generally reflected positive work evaluations with markings of "satisfactory," "very good" and "outstanding." Starting in 2007, however, her work evaluation stated that Dixon needed improvement in her rate of unscheduled absences.

Mount Olivet's attendance policy stated that an employee with three absences from work in three months, or two in one month, was subject to disciplinary action. Employee discipline was rendered under a five step progressive policy that included verbal counseling, written warnings, unpaid suspension, and eventually termination. When an employee was disciplined, they would receive a counseling statement which would outline the infraction, level of discipline imposed, and remedy. Disciplinary matters relating to attendance were treated as being distinct from other workplace discipline.

In March 2007, Dixon received a counseling statement after she had more than three absences in a three-month period. She received another counseling statement in February 2008 and again in March 2008. According to the March 2008 statement, Plaintiff had earned a suspension, but it was waived by Nelson.

## B. FMLA Leave

Around June 2008, Dixon began suffering from severe pain and discomfort in her abdominal area that was affecting her work and daily life. She called in sick to work on June 17-19, 2008, citing stomach pain as her ailment. On June 18, 2008, she sought medical treatment and learned from her doctor that she likely had a uterine fibroid condition. On June 25, 2008, Dixon missed work again for a follow up appointment with her doctor, who officially diagnosed her with a uterine fibroid condition and prescribed her medication pending an evaluation for surgery.

There is an issue of fact as to when Dixon informed Mount Olivet about her condition. Regardless, on July 9, 2008, Mount Olivet issued Dixon another counseling statement and a one-day suspension for excessive absenteeism. Dixon complained about the suspension to Welin and Nelson, but it was ultimately upheld.

Dixon then called the Department of Labor ("DOL"), Wage and Hour Division, and had Bill Buckingham fax her DOL FMLA forms on July 22, 2008. Her physician filled out the paper work on July 25, 2008, and noted Plaintiff's medical condition and treatment. Dixon returned to Mount Olivet with the completed FMLA paperwork and presented the forms to Comeau and Nelson.

Dixon complained about not being told of her FMLA rights by Mount Olivet, and asked that her suspension be rescinded and lost wages paid out to her. Nelson did not, however, grant Dixon's request.

Four days later, on July 29, 2008, Dixon handed Nelson a typewritten letter that stated that she believed she was being discriminated against on account of her race and medical condition, and that she was requesting a complete investigation by Mount Olivet. Although not stated in the letter, Dixon's complaints of racial discrimination centered on her belief that white employees were treated more leniently with regard to absences, and that Mount Olivet management did not conduct a fair investigation when three white employees accused a black employee of calling them a racial slur. Specifically, Plaintiff believed that she was not permitted to speak and offer her observations at a meeting involving the accusation.

Mount Olivet maintains a policy that prohibits discrimination in the workplace and declares that Mount Olivet will "promptly investigate all claims of harassment and/or reprisal and will take action as appropriate and necessary." (Halunen Aff., Ex. 31.) Mount Olivet, however, has no records relating to an investigation of Dixon's complaint and Nelson admits that because she believed

the complaint referred only to Dixon's FMLA issue, she did not conduct a full investigation.

After receiving the letter, Nelson and Hokanson called Dixon into a meeting later that same day on July 29, 2008, to tell her that an investigation had been conducted and that they determined there was no discrimination. Nelson and Hokanson then offered Dixon a Separation Agreement and Release, effectively asking her to leave her employment at Mount Olivet, the first such agreement offered to a non-management employee in the last ten years. Hokanson explained that the agreement was good for all parties because the working environment had turned into a hostile place and that if Dixon did not sign, it would become unpleasant. Hokanson maintains that Mount Olivet had its attorney draft the agreement for Dixon in May 2008, as result of building tension on Plaintiff's work floor. In any case, Dixon declined to sign the agreement.

On July 30, 2008, Dixon faxed a letter to Buckingham, indicating that Mount Olivet would not honor her FMLA paperwork and that she was instead asked to sign a Separation Agreement and Release. On August 12, 2008, DOL informed her that Investigator Corey Walton had been assigned to investigate Mount Olivet's FMLA practices. On September 24, 2008, Walton and Nelson

spoke by phone and Nelson agreed to amend Dixon's counseling statement to remove her absences for June 18 and 19, but not for June 17 and 25. Nelson admitted at her deposition that all of the above-listed dates were related to Dixon's family medical leave, but the DOL's investigation report stated that it was unable to substantiate whether the absence on July 17, 2008 was protected by FMLA. The report also stated that the number of non-FMLA absences was still sufficient to warrant a possible suspension. On September 29, 2008, Mount Olivet issued a revised counseling statement that made no mention of June 18 and 19, but included two days missed for a car accident, one day for a toothache, and the June 17 and 25 absences. As a result, Dixon's suspension was upheld.

### C. Plaintiff's Alleged Whistleblower Report

On August 7, 2008, Mount Olivet implemented a new absence policy, whereby it would not replace nurse assistants who called in absent to work. Dixon claims that she told Welin that she was concerned about the effect on resident care because the under-staffing was leading to residents not eating on time and not being bathed, toileted or walked on time. On August 10, 2008, Dixon claims that she telephoned the Minnesota Department of Human Services and reported that Mount Olivet residents were being neglected. She did not, however, notify anyone at Mount Olivet that she had made this phone call.

Finally, on October 22, 2008, Dixon noticed a resident showing signs of pain at approximately 9:30 a.m. She told the nurse on duty to look at the resident, but the nurse did not notify Welin and Comeau of the resident's need for a check-up until 1:30 p.m. that day. The resident was eventually diagnosed with a broken arm. When Welin told Dixon that the nurse had noticed the resident's injury at around 1:00 p.m. that day, Dixon indicated that this was incorrect.

### D. Plaintiff's Demotion

On October 21, 2008, Plaintiff was issued a counseling statement that disciplined her for "ineffective role modeling, team work and interactions with coworkers." (Halunen Aff. Ex. 21.) Specifically, she was accused of frequently sitting around with a nurse, making remarks about "the white women" or "the sisters," taking longer breaks than allowed, and not toileting or walking her residents as required. (Id.) The statement also stated that "[t]he perception of [her] interactions and this type of role modeling reported have contributed to an uncomfortable work environment, disrupted team work, raised questions of racial innuendo, and given the impression that [she] receive preferential treatment." (Id.) Dixon was demoted from the NA/R Coordinator position to

NA/R, received a reduction of $.50 less an hour, and was told that she would be transferred to a different work floor.  (Id.)

According to Mount Olivet, the basis for this demotion was that Dixon's floor was rampant with tension between three white female employees and Dixon, leading to many complaints from both sides.  As things did not improve, Nelson elected to split up the floor.  As part of this restructuring, one of the white employees received a written counseling and new floor assignment, and another received a two and a half day suspension and transfer.

Plaintiff was never asked for a written statement or afforded an opportunity to respond.  An additional October 21, 2008 written statement provided by Welin gave no indication of any wrongdoing by Dixon.  (See Halunen Aff., Ex. 11.)  Finally, Nurse Assistant Nancy Bernard testified that there had not been any racial issues on the floor before the three white employees had come.

In response to the discipline and demotion, Plaintiff wrote a four-page rebuttal.  She complained of racially motivated harassment by the three white employees.  Hokanson testified that he took Plaintiff's rebuttal to be a report of race discrimination and harassment in the workplace.  He testified that he

directed Nelson, Comeau and Welin to conduct an investigation. The parties dispute, however, whether an investigation ever took place.

### E. FMLA Surgery Leave

Shortly after Plaintiff was demoted and disciplined, she took FMLA leave for surgery to correct her uterine fibroid condition. This surgery cured all of the symptoms she had been suffering as a result of her condition. After surgery, Plaintiff received a note from her doctor stating that she could return to work on November 24, 2008, with a two week lifting restriction of no more than twenty pounds. Plaintiff took this return to work form to Comeau, who told her that she could only return to work if her doctor would release her to work with no restrictions. Plaintiff's doctor refused to give such a release.

According to Nelson, Mount Olivet's policy was that an employee may only return to work after an FMLA leave if she has her doctor sign a fitness of duty form stating that the employee is able to perform her job duties one-hundred percent. The nursing assistant position Plaintiff held is described as having the following physical demands: (1) lifting weight in excess of twenty-five pounds; (2) assisting residents weighing in excess of three hundred pounds; (3) prolonged walking, standing, sitting, use of pushing, pulling, bending and stooping movements; and (4) changes in daily work hours and schedule.

(Harder Aff. Ex. 14.) Bernard testified that a nursing assistant was required to lift more than twenty pounds 84-112 times per day and Comeau and Welin testified that nursing assistants could not do this job with lifting restrictions of twenty pounds.

Comeau testified that employees were not able to return to work with restrictions due to safety concerns. It was Mount Olivet's policy to disallow an employee to work with restrictions unless the restrictions were caused by a workers' compensation injury. As a result, nobody from Mount Olivet asked Welin if there was a job modification for Dixon so that she could return to work with the twenty-pound restriction.

On December 5, 2008, Dixon faxed a letter of resignation to Mount Olivet, declaring that she was terminating her employment as a result of retaliation taken by Nelson, Comeau, and Mount Olivet for reporting them to the DOL for discrimination.

### F.  Conclusion of Employment and Commencement of Suit

On April 8, 2009, Dixon filed the Complaint in Hennepin County District Court with five claims of discrimination and retaliation. On May 11, 2009, Mount Olivet removed the Complaint to this Court. On March 1, 2010, Dixon filed a Motion for Partial Summary Judgment on Count 2, discrimination on the

basis of disability [Docket No. 37]. On March 2, 2010, Mount Olivet filed a

Motion for Summary Judgment on all counts [Docket No. 51]. As noted above,

Plaintiff has voluntarily dismissed Count 1 of the Complaint with prejudice.

**III.   DISCUSSION**

**A. Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact. Celotex, 477 U.S. at 323. Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes that

are irrelevant or unnecessary will not be counted. (Id.) The court must view the

evidence, and the inferences that may be reasonably drawn from it, in the light

most favorable to the non-moving party. Graves v. Arkansas Dep't. of Fin. &

<u>Admin.</u>, 229 F.3d 721, 723 (8th Cir. 2000). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).

### B. Disability Discrimination Under MHRA

Dixon moves for partial summary judgment on her MHRA claim of disability discrimination under the theory that Mount Olivet failed to provide her with a reasonable accommodation to her disability. Specifically, Dixon claims that Mount Olivet failed to accommodate her post-surgery twenty-pound lifting restriction. Mount Olivet moves for summary judgment, arguing that Dixon cannot show she suffered from a qualified disability or that she was able to perform her essential job functions with a twenty-pound lifting restriction.

"Under Minn. Stat. § 363.03, subd. 1(6), employers with the requisite number of employees are required to 'make reasonable accommodation to the known disability of a qualified disabled person.'" <u>Hoover v. Norwest Private Mortg. Banking</u>, 632 N.W.2d 534, 547 (Minn. 2001). "A qualified disabled person is a disabled person 'who, with reasonable accommodation, can perform the essential functions' of the job in question." <u>Id.</u> (quoting Minn. Stat. § 363.01, subd. 35(1)(2000)). Thus, in order for Dixon to prevail on her motion for partial

summary judgment, she must establish that there is no genuine issue of material fact that: (1) she had a disability; (2) her employer knew of the disability; and (3) her employer failed to make a reasonable accommodation for that disability. See id. "[A] claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive." Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004).

Under the MHRA, a disabled person is one who: "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Hoover, 632 N.W.2d at 543. "In applying MHRA, state courts get guidance from the interpretation of analogous federal anti-discrimination statutes by federal courts." Lang v. City of Maplewood, 574 N.W.2d 451, 453-54 (Minn. Ct. App. 1998) (citations omitted). "Under the federal Americans with Disabilities Act (ADA) a 'qualified individual with a disability' is defined as an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" Id. (citing 42 U.S.C. § 12111(8) (1994)).

The parties heavily dispute whether Dixon was a qualified disabled person prior to her uterine fibroid surgery. The Court, however, finds that this

determination is unnecessary because Dixon's claim is based on Mount Olivet's failure to accommodate her after her surgery. Therefore, the proper inquiry is whether Dixon was disabled as a result of her post-surgery two-week twenty pound lifting restriction.

With regard to temporary impairments, the Minnesota Court of Appeals has held as follows:

> Neither the MHRA nor Minnesota caselaw addresses the requisite duration of a disability before a person can qualify as a disabled person. But our courts have customarily followed and applied federal law to various aspects of discrimination claims. And recent federal cases interpreting the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12213, have consistently held that a disability must be permanent or long term, rather than temporary or transitory, to qualify a person for protection against discrimination. Furthermore, it seems reasonable that a temporary incapacitation is not what is intended by the concept of disability, for otherwise the act would apply so broadly that virtually everyone would fit into the protected class at one time or another. Under the broad interpretation, anyone who, because of nonpermanent illness or injury, is restricted to bed rest for several days or weeks would qualify for the act's protection.

Cramer v. Allina Health Sys., 2003 WL 22952381, at *2 (Minn. Ct. App. Dec. 16, 2003) (internal citations omitted). The Eighth Circuit has similarly held that a limited recuperation period after successful surgery to repair even a chronic condition is insufficient to show a disability under the MHRA. Liljedahl v Ryder Student Transp. Serv., Inc., 341 F.3d 836, 841 (8th Cir. 2003).

Here, Dixon was not a qualified disabled person when she sought to return to work because she could have simply waited two weeks for her weight restriction to be lifted.  Accordingly, Dixon's disability discrimination theory fails as a matter of law and summary judgment is warranted in Mount Olivet's favor. Because the Court has already determined that Dixon was not disabled according to the MHRA, it declines to address Mount Olivet's argument involving essential job functions, or Dixon's argument that Mount Olivet's 100% healed policy constituted a *per se* violation of the MHRA.

### C.  Reprisal in Violation of the MHRA

Mount Olivet moves for summary judgment on Plaintiff's claim of reprisal under the MHRA.  The MHRA provides that it is an "unfair discriminatory practice for an employer to "intentionally engage in any reprisal" against a person because that person opposed the employer's alleged discriminatory practices.  Minn. Stat. § 363A.15(1).  The Court applies a <u>McDonnell Douglas</u> burden-shifting analysis to discrimination and retaliation claims brought under the MHRA.  <u>See</u> <u>Wilking v. County of Ramsey</u>, 153 F.3d 869, 872 (8th Cir.1998) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973)).  Under <u>McDonnell Douglas</u>, the plaintiff must first establish a prima facie case of reprisal.  <u>See</u> <u>Wilking</u>, 153 F.3d at 872 (citation and quotation omitted). The

burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  Id. at 872-73.  If the defendant satisfies its burden, the plaintiff must show that the defendant's reason is pretext for unlawful discrimination.  Id. at 873.

To show a prima facie claim of reprisal, a plaintiff must establish: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two."  Hoover v. Norwest Private Mortg. Banking 632 N.W.2d 534, 548 (Minn. 2001) (quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).

Reprisal includes "any form of intimidation, retaliation or harassment." Id.  It is reprisal for an employer to "refuse to hire the individual; depart from any customary employment practice; transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status, or inform another employer that the individual has engaged in [protected] activities."  Id.

### 1.  Statutorily Protected Conduct

"[T]he first 'statutorily protected conduct' prong of an MHRA reprisal claim is satisfied when a plaintiff alleges facts supporting a good-faith, reasonable belief that the conduct opposed constituted a violation of the

MHRA."  Bahr v. Capella University, 765 N.W.2d 428, 436 (Minn. Ct. App. 2009).

Dixon's July 29, 2008 letter stated that she believed she was being discriminated

against on account of her race and medical condition, and that she was

requesting a complete investigation by Mount Olivet.

Mount Olivet argues that Dixon's decision to voluntarily dismiss her racial

discrimination claim evinces her unreasonable belief of an MHRA violation.   At

the time of her letter, however, Dixon had already approached Nelson with

FMLA forms indicating the existence of her uterine fibroid condition, only to

have Nelson deny exemption of her covered absences.  Moreover, based on her

observations, Dixon felt that white employees were treated more leniently than

black employees with regard to absences, and investigations into employee

misconduct were unfairly conducted in favor of white employees.  As a result,

the Court concludes that there is a genuine issue of fact as to the reasonableness

of Dixon's belief of discrimination.

### 2.  Adverse Employment Action

Mount Olivet also insists that Plaintiff did not suffer an adverse

employment action that falls under the purview of the MHRA.  In a

whistleblower action, the Minnesota Court of Appeals "adopted the definition of

adverse employment action used by the Eighth Circuit to evaluate Title VII

violations: an ultimate employment decision that creates a material change in the terms or conditions of … employment." <u>Grothe v. Ramsey Action Programs, Inc.</u>, 2006 WL 1529447 at *4 (Minn. Ct. App. June 06, 2006) (citing <u>Lee v. Regents of the University of Minn.</u>, 672 N.W.2d 366, 374 (Minn. Ct. App. 2003)).

Dixon insists that the adverse employment action in this case involved a series of acts by Mount Olivet management that led to her constructive discharge. "A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit." <u>Kimzey v. Wal-Mart Stores, Inc.</u>, 107 F.3d 568, 574 (8th Cir. 1997); <u>Dietz v. Minn. Mining & Mfg.</u>, 564, N.W.2d 575, 579 (Minn. Ct. App. 1997). According to the Eighth Circuit, the employer's actions "must have been deliberate, that is, they must have been taken with the intention of forcing the employee to quit." <u>Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.</u>, 130 F.3d 349, 354 (8th Cir. 1997) (citation omitted). A plaintiff can "satisfy the intent requirement with proof that her resignation was a reasonably foreseeable consequence of her employer's discriminatory actions." <u>Haneburg v. Principal Mut. Life Ins. Co.</u>, 118 F.3d 570, 574-75 (8th cir. 1997). Further, "[i]f an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge." <u>Kimzey</u>, 107 F.3d at 574 (citation omitted). Additionally, a

constructive discharge is shown when a plaintiff lacks recourse within the

employer's organization, or when management is indifferent to the employee's

complaints.  See Delph, 130 F.3d at 356-57.

Still, an employee may not be unreasonably sensitive to her working

environment.  Johnson v. Bunny Bread, 646 F.2d 1250, 1256 (8th Cir. 1981).  A

slight decrease in pay, coupled with the loss of some supervisory responsibilities

is insufficient to constitute a constructive discharge.  Allen v. Bridgestone/

Firestone, 81 F.3d 793, 797 (8th Cir. 1996).  An employee who quits without

giving her employer a reasonable chance to work out her problem has not been

constructively discharged.  Phillips v. Taco Bell Corp., 156 F.3d 884 (8th Cir.

1998).

Viewing the facts in Dixon's favor as the non-moving party, Dixon

suffered several negative employment actions that resulted in her decision to

terminate her job.  Specifically, Mount Olivet management failed to investigate

Dixon's claims of discrimination and instead requested her to resign on the same

day she made her complaint.  Hokanson wanted Dixon to resign and even

warned that if she stayed, the work environment would become unpleasant.  The

Court also notes how racial tensions on her floor were improperly handled, and

how Dixon was placed on step 4 of a disciplinary scale on October 21, 2008, after

never having been disciplined for similar conduct.  She was also allegedly ignored and silenced during the meeting involving the allegation against her black coworker.  Based on this evidence, the Court concludes that Dixon has raised a genuine issue of fact as to her constructive discharge.

### 3.  Causation

Mount Olivet also argues that summary judgment is warranted because there was no causal connection between Dixon's July 28, 2008 letter and the alleged constructive discharge.

"Evidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to establish a causal link."  <u>Hite v. Vermeer Mfg. Co.</u>, 446 F.3d 858, 866 (8th Cir. 2006) (citation omitted).  With regard to retaliation claims relying exclusively on temporal proximity, the Eighth Circuit has held:

> An employee can establish a causal link between her protected activity and the adverse employment action through the timing of the two events.  A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement.  The mere coincidence of timing, however, is rarely sufficient to establish the causation element.  Cases in which we have determined that temporal proximity alone was sufficient to create an inference of the causal link have uniformly held that temporal proximity must be very close.

<u>Id.</u> at 866.

Mount Olivet correctly argues that a gap of three months between the complaint letter and Dixon demotion is insufficient alone to serve as proof of a causal connection. See, e.g., Pope v. ESA Services, Inc., 406 F.3d 1001, 1011 (8th Cir. 2005) (four month gap was insufficient); Kipp v. Missouri Highway & Transport Commission, 280 F.3d 893, 897 (8th cir. 2002) (two month gap "dilutes" inference of causation). In Pope and Kipp, however, there was no additional evidence of retaliatory intent aside from the temporal proximity, as there is here. And in Peterson v. Scott County, the court found that a two-week period between complaint and termination, plus an administrator's response to the plaintiff's complaint with the comment "maybe you should be somewhere else," provided sufficient evidence of retaliatory intent to survive summary judgment. 406 F.3d 515, 524 (8th Cir. 2005).

Although the time between Dixon's complaint letter and her demotion is considerable, her demotion was only part of a series of adverse actions that began with an attempt to get Dixon's resignation. Furthermore, the Court concludes that Hokanson's alleged comments about an unpleasant work environment suffice to create an implication of retaliatory intent for a jury to decide.

### 4. Legitimate Business Reason

Mount Olivet asserts that there are legitimate business reasons behind each of the actions supporting Dixon's allegation of constructive discharge but Dixon responds by arguing that the stated business reasons are simply pretext for retaliatory intent. A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981).

First, Mount Olivet argues that Nelson believed the July 29, 2008 letter to be strictly related to the FMLA leave dispute and therefore had no need to investigate Dixon's claim of discrimination because she was fully aware of why she had rendered a suspension. Moreover, Nelson claims that she had just begun the interactive process with Walton of the DOL and felt that she was not allowed to interview Dixon regarding her claim of discrimination.

Considering the facts in Dixon's favor, the Court is not convinced. On the same day as Dixon's complaint letter, Nelson and Hokanson stated that they completed their investigation and found no discrimination. Moreover, Nelson plainly admits to violating Mount Olivet's own policy of promptly investigating all claims of discrimination. Nelson's failure to take Dixon's complaint seriously

and clarify all possible bases for discrimination does not constitute a legitimate business decision.

Next, Mount Olivet claims that the elimination of Dixon's coordinator duty was a result of a collective action to remedy her dysfunctional work floor and to improve resident care. It claims that, as a business decision, it was justified in penalizing all parties involved, including Plaintiff. See Haas v. Kelly Services, Inc., 409 F.3d 1030, 1036 (8th Cir. 2005) (holding that a business "can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so").

Dixon, however, has raised an issue of fact as to whether Mount Olivet discriminated in the manner it conducted its own personal policies and procedures for punishment of employees. Specifically, Plaintiff argues that her demotion was not adequately investigated and that Mount Olivet failed to engage their standard business practices when it came specifically to her. Dixon claims that she was never interviewed, but that written statements were solicited from the employees who she had a dispute with.

Because Dixon has raised genuine issues of fact as to each component of her reprisal claim, the Court denies Mount Olivet's motion for summary judgment.

### D. Retaliation Under FMLA

Similar to the MHRA reprisal claim, retaliation claims under the FMLA are analyzed pursuant to <u>McDonnell-Douglas</u>. <u>Dillaway v. Ferrante</u>, Civ. No. 02-715 (JRT/JSM), 2003 WL 23109696 at *4 (D. Minn. Dec. 9, 2003). "To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's actions and the adverse employment action." <u>Darby v. Bratch</u>, 298 F.3d 673, 679 (8th Cir. 2002) (citation omitted).

### 1. Protected Activity

Mount Olivet admits that Dixon's complaint to the DOL constituted statutorily protected conduct. The Court also finds that Dixon engaged in protected activity when she contacted Nelson to protest her suspension and inclusion of FMLA absences in her counseling statement.

### 2. Adverse Employment Action

Mount Olivet restates the same position regarding this element as it takes when disputing Dixon's MHRA reprisal claim. As stated above, the Court finds there are genuine issues of fact as to whether Dixon was constructively discharged. Consequently, an adverse employment action was established and this element is met for the purpose of this motion.

### 3. Causal Connection

Mount Olivet challenges whether Dixon has illustrated a causal connection between her protected activity and constructive discharge.

Mount Olivet became aware of Dixon's uterine fibroid condition on July 25, 2008, when Dixon provided Nelson with FMLA forms indicating her diagnosis. At that time, Nelson refused to accept Dixon's absences as exempt under the FMLA. Four days later, Dixon wrote the discrimination letter mentioned above. In light of the nearly identical timeline as the facts supporting Dixon's MHRA claim, the Court adopts the same analysis from its previous section on causation. Accordingly, the Court finds genuine issues of fact as to the existence of a causal connection, and denies summary judgment.

### E. Violation of Minnesota Whistleblower Act

According to the Minnesota Whistleblower Act,

> [a]n employer shall not discharge, discipline, threaten, otherwise
> discriminate against, or penalize an employee regarding the
> employee's compensation, terms, conditions, location, or privileges
> of employment because:
>
> (1) the employee . . . in good faith, reports a violation or suspected
> violation of any federal or state law or rule adopted pursuant to law
> to an employer or to any governmental body or law enforcement
> official . . . .

Minn. Stat. § 181.932, subd. 1. Courts apply the McDonnell Douglas burden shifting analysis to whistleblower claims filed under this Act. Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).

In order to establish her prima facie case, Plaintiff "must show: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Id. (citation omitted). According to the Minnesota Supreme Court:

> A whistleblower claim need not identify the specific law or rule that
> the employee suspects has been violated, so long as there is a federal
> or state law or rule adopted pursuant to law that is implicated by the
> employee's complaint, the employee reported the violation or
> suspected violation in good faith, and the employee alleges facts
> that, if proven, would constitute a violation of law or rule adopted
> pursuant to law.

Abraham v. County of Hennepin, 639 N.W.2d 342, 354-55 (Minn. 2002).

Even considering the facts in a light most favorable to Dixon, the Court concludes that her whistleblower retaliation claim fails as a matter of law. Dixon

admits that she never notified Mount Olivet management about her call to the

Minnesota Department of Human Services.  If Dixon's alleged whistleblowing

was unknown or anonymous, then Mount Olivet could not have logically

retaliated against her.   Furthermore, Dixon's October 22, 2008 report to Welin

occurred after she had already been demoted.  Thus, there was no conceivable

way that the allegedly adverse employment actions Dixon suffered had any

relation to her alleged whistleblowing.

## IV.    ORDER

Based on the files, proceedings, and arguments in the record, the Court

**hereby ORDERS** that

1.  Plaintiff Vera Dixon's Motion for Partial Summary Judgment [Docket No. 37] is **DENIED.**

2.  Defendant Mount Olivet's Motion for Summary Judgment [Docket No. 51] is **GRANTED IN PART and DENIED IN PART** such that summary judgment is **GRANTED** on counts 2 and 5 of the Complaint, and summary judgment is **DENIED** on counts 3 and 4 of the Complaint.

Date:  September 17, 2010                          s/ Michael J. Davis
                                                   Michael J. Davis
                                                   Chief Judge
                                                   United States District Court